Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| SCOTT G. and S.G.G., <br><br> Plaintiffs, <br><br> vs. <br><br> GODADDY.COM, LLC and THE GODADDY.COM, LLC WELFARE BENEFIT PLAN, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 2:23-cv-00089-DAO <br><br> Magistrate Judge Daphne A. Oberg |

**COME NOW** Scott G. and S.G.G. collectively, individually and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Scott G. ("Scott") is a natural person residing in Redmond, Washington. He is covered by the GoDaddy.com, LLC Welfare Benefit Plan ("the Plan") provided through Scott's employer, GoDaddy.com, LLC.

2. Plaintiff S.G.G. ("S.G.G.") is a resident of Redmond, Washington. As a beneficiary of his father's health insurance plan, he received treatment at New Directions for Young Adults

1

("New Directions"), a licensed residential treatment facility in Deerfield, Florida, from September 4, 2018, through July 31, 2019.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the Defendants do business in the State of Utah and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of S.G.G's denied claims from September 4, 2018, through July 31, 2019, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## **FACTUAL BACKGROUND**

7. S.G.G. had previously been diagnosed with Attention Deficit Disorder, but had not employed any treatment interventions nor was he prescribed psychostimulant medication. Scott advocated for S.G.G., along with his primary physician, Dr. Conley, to be prescribed a course of psychostimulant to improve his focus.

8. S.G.G. complained of anxiety, difficulty following through on tasks, and poor task initiation initially.

9. By mid-to-late August S.G.G.'s mood began to quickly deteriorate and he reported bouts of futility and hopelessness. He described his experience of these moods overcoming him as if "a fuse has blown out.". There were no significant life changes or identified external events that accounted for these overwhelming feelings.

10. S.G.G. was referred to his physician for re-evaluation and Dr. Conley prescribed an SSRI to accompany the psychostimulant in September. S.G.G. had an immediate adverse reaction to the initial SSRI. In October 2015, he was prescribed Effexor instead.

11. S.G.G. had been experiencing significant depressive symptoms for over two months and he had returned to school. His condition continued to deteriorate; his mood was compromised, he had littler energy, he was socially isolated for much of the day, he was struggling with school attendance, work completion, and overall functioning.

12. S.G.G. was barely functioning and was admitted to Fairfax Adolescent Partial Hospital Program.

13. By late February, S.G.G. was not attending school. He was excessively restless, was not sleeping for long periods and presented at therapy sessions with pressured speech. S.G.G. reported a mild hallucination and wanted to be seated away from doors and windows, because he believed someone was looking over his shoulder.

14. S.G.G. was readmitted to Fairfax Partial Hospital Program for three weeks and was discharged with a diagnosis of Bi-polar Disorder. He returned to twice-a-week outpatient therapy, began attending weekly Dialectical Behavior Therapy Group, and met regularly with his psychiatrist, Dr. Kwon.

15. S.G.G.'s parents both worked full-time and the family was challenged to provide the one:one direct oversight he required. S.G.G. developed symptoms of increasing social isolation, mood lability, and concerning fantasies. Mild persecutory hallucinations developed and persisted.

16. By the end of October 2017, S.G.G. was voluntarily admitted to an adult inpatient program for suicidal ideation and concerning fantasies. He was discharged to the adult partial hospital program and by November he had withdrawn from school and had quit his part-time job.

17. All treatment programs, including: intensive outpatient with individual, family, and group therapy; acute partial hospitalization; acute inpatient hospitalization; one:one support general education; and special education, had failed. The only treatment program not tried was residential treatment.

18. In 2018, S.G.G. enrolled in Summit Prepartory School. Despite psychological therapy and psychiatric treatment in the Summit Program, S.G.G. continued to experience bouts of depression and anxiety. As one of the few 18-year-olds in a program inhabited mainly by 15- to17-year old patients, S.G.G. found the close supervision oppressive.

19. S.G.G. had begun to eat and purge during his final two months at Summit. He expressed body dysphoria and saw purging as a way to limit the effects of his overeating.

20. S.G.G. threatened on several occasions to check himself out and walk into the Montana wilds alone and with no money or other local support resources. Such plans are often indiciative of passive suicidal ideation.

21. On one occasion S.G.G. drank laundry detergent in an attempt at suicide/self-harm, resulting in an emergency-room visit and psychiatric hospitilization.

22. Realizing S.G.G. might depart unsafely on his own, Scott contacted a consultant familiar with therapeutic and transitional programs. She advised Scott to find an adult-transitional program with a staff or affiliated psychiatrist esteemed in treating young adults with bipolar diagnoses in which few programs exist. Scott found New Directions for Young Adults fit S.G.G.'s needs.

23. New Directions provides 24/7 monitoring, proactive mentoring, regular psychotherapy, academic advising, proactive mentoring and access to Dr. Aron Tendler, renowned for his work with bipolar young adults. S.G.G. felt the setting and services could help him stabilize while achieving his therapeutic and personal goals.

24. S.G.G. experienced an anxiety attack on December 4, 2018. He expressed thoughts of suicide and/or self-harm. Emergency Room staff referred S.G.G. for intake at a nearby psychiatric hospital, where he met criteria and was admitted. S.G.G. stayed approximately one week before being judged stable and discharged on or about December 10th.

25. Scott visited two weeks later, on Christmas Day and met with S.G.G. and his psychiatrist, Dr. Tendler. S.G.G. admitted his bulimic compulsions during this session and stated he'd been binging and purging since about July of that year.

26. Dr. Tendler has expertise in treating bulimia and other eating disorders, it was decided that S.G.G. would remain at New Directions and continue treatment.

**Pre-Litigation Appeal of the Plan's Denial of Coverage for S.G.G.'s Care**

27. The Family first received notice of S.G.G.' denied coverage of his treatment at New Directions through convoluted EOB's they received in the mail.

28. On September 26, 2019, S.G.G.'s parents submitted a Level One Appeal to United Behavioral Health (UBH) for denial of coverage for S.G.G's treatment at New Directions from September 4, 2018, onward to his then future date of discharge.

29. Scott stated in his Level One Member Appeal: "I have received various Explanation of Benefits (EOB) over the last several months, each containing a variety of reasons for denying S.G.G.'s claim from New Directions:"

30. "First...services rendered between September 2018 and April 2019 were denied

under note code B6: Benefits for this service are denied. We sent a letter to the provider asking for additional information. We have not received a response."

31. "Second...services rendered in October 2018, November 2018, December 2018, and April 2019, were initially denied under note code B6: Benefits for this service are denied. We sent a letter to the provider asking for additional information. We have not received a response. Later, these same dates of service were denied under code GV: Benefits for this service are denied. We received the additional information requested from the provider. However, it was not received within the required timeframe. If you don't agree with this decision. Please refer to the appeal instructions in this statement."

32. "Third...services rendered in February 2019 and March 2019 were initially denied under note code B6: Benefits for this service are denied. We sent a letter to the provider asking for additional information. We have not received a response. Later, these same dates of service were denied under note code S8: Your plan provides benefits for services that are determined to be covered health services. The information received does not support measurable progress toward defined treatment goals for these services.Therefore, additional benefits are not available."

33. Lastly...services rendered in January 2019 were initially denied under not code B6: Benefits for this service are denied. We sent a letter to the provider asking for additional information. We have not received a response. Later, these same dates of service were denied under note code UF: complete medical records are required in order to process this claim."

34. Despite multiple requests to further explain these bases of denial, UBH provided no further information.

35. Scott went on to write, "My plan with United is a self-funded plan available to employees of GoDaddy.com, LLC...subject to Employee Retirement Income Security Act of 1974

(ERISA)…[the Plan is]obligated to provide me with certain rights as you review my appeal:

   a. …Review all applicable information.
   b. …Reviewers assigned to a case be appropriately qualified to review it, and that the identity of any and all reviewers be disclosed…
   c. …Assign a reviewer who is board certified in psychiatry and has experience treating young adults with attention-deficit hyperactivity disorder, bipolar I disorder, cannabis use disorder, and other high risk behaviors in a transitional setting."

36. "I have reviewed your various denial correspondence and disagree with all of these adverse benefit determinations…I will provide you with evidence showing that United Behavioral Health's denial of S.G.G.'s treatment were an error…I will address each denial reason in order that I received them."

37. "Services rendered between September 2018 and April 2019 initially denied under note code B6. According to United, a request was sent to New Directions regarding information needed to process my claims…The information United requested from New Directions was a copy of S.G.G.'s medical records."

38. "I have documentation of United receival of this…S.G.G.'s medical records from New Directions were faxed to United on May 17, 2019. Despite receiving confirmation that United received this fax transmission…I never received acknowledgement that my claims were reprocessed with these medical records."

39. "Instead of reprocessing my claims, I received a denial EOB from United in September 2019, stating services rendered in October 2018, November 2018, December 2018, and April 2019, were denied under note code GV."

40. "According to my plan, I am allowed 45 days to submit any information required to complete the processing of my claim. United's first EOB requesting information was on April

12, 2019...United received S.G.G.'s records on May 17, 2019...The requested information was received within the 45-day timeframe given by my plan."

43. "I received a second EOB in September 2019, stating that medical records for services rendered in January 2019 were incomplete...Medical records for February 2019 and March 2019 did not support "measurable progress toward defined treatment goals."

42. "[It is] Contradictory for United to claim S.G.G.'s medical records were incomplete, yet complete enough to determine that they did not indicate sufficient progress."

43. Scott then researched United's medical necessity criteria and found that UBH's *Optum Level of Care Guidelines* criteria includes coverage for supervised living and sober living levels of care. New Directions is a young adult transitional program and S.G.G. carries a dual diagnosis of mental health and substance use disorders.

44. Pursuant to UBH's guidelines, Scott argued in his appeal, "Admission to a supervised living program is appropriate following discharge from a residential treatment center (RTC). S.G.G. stepped down to New Directions' transitional living program after completing treatment at Summit Preparatory School, a RTC."

45. Scott went on to aruge that "Requested copies of S.G.G.'s medical records from Summit Preparatory School...show he received treatment...from January 20, 2018 to August 30, 2018. Based on all this information...S.G.G.'s admission to New Directions was medically necessary based on United's own criteria."

46. "United's allegation that S.G.G.'s treatment was denied because he was "not making sufficient progress towards defined treatment goals"...suggests treatment was not denied because S.G.G. made *no progress*...rather S.G.G. had not made sufficient progress within an arbitrarily predetermined time frame."

47. "If United is limiting coverage for behavioral health treatment services...within an arbitrary time frame...[we are] concerned [UBH] may be applying a non-quantitative treatment limitation, which has been prohibited under federal mental health parity law (the MHPAEA)."

48. "...My plan includes coverage for subacute behavioral health treatment and subacute medical treatment, federal law requires that United administer these benefits at parity with one another."

49. "...Review of United's subacute medical criteria including skilled nursing facility services, and inpatient cognitive rehabilitation services...United does not arbitrarily limit the amount of time in which a patient must make substantial progress, in order for treatment to be covered."

50. "[It is] unlawful for United to limit behavioral health coverage to treatment that results in substantial progress within an arbitrarily determined amount of time."

51. Scott then asked UBH to "conduct a parity analysis to determine whether or not my plan is truly being administered in compliance with the MHPAEA." He also requested "a copy of any administrative services agreement that exist, any clinical guidelines or medical necessity criteria utilized to evaluate the claim, any mental health, substance use disorder, skilled nursing facility, inpatient rehabilitation, or hospice medical necessity criteria used to administer my plan, and any reports or opinions provided to you from a physician or other professional about this claim."

52. UBH did neither in the responsive denial letter dated December 16, 2019, in which it upheld its denial due to lack of medical necessity. More specifically, UBH cited to residential treatment criteria in upholding its denial and stated that S.G.G. could have been treated at an Outpatient level of care because "he was doing fairly well" and "was motivated."

53. On February 10, 2020, the G. Family submitted a Level Two Appeal, in which Scott noted that his son's treatment was Transisitonal care, not Residential Treatment, which made him concerned that UBH used the wrong criteira in reaching its decision.

54. Scott also noted that the reviewer did not appear to review all dates of service, nor did they respond to any of the specific questions he asked in his first level appeal.

55. Scott included a lot of S.G.G.'s medical history, recited in part above in the Fact's Section. He noted that his son had failed Outpatient treatment and was suicidal without first attending Residential Treatment and then moving to Transitional care.

56. On March 14, 2020, the Plan responded to the Level Two Appeal upholding the denial due to medical necessity. They provided an nearly identical basis of denial and did not respond to any of the questions Scott raised in his other appeal letters. This was the final decision from the Plan.

## CAUSES OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

57. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

58. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

59. In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals

who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) )C.F.R. §2560.503-1(h)(3)(iii).

60. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the G. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for S.G.G.'s claim denial, written in a manner calculated to be understood by the G. Family;  2) by failing see that S.G.G.was a threat to himself and others 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the S.G.G.'s claim.

## Claim for Relief for Violating the Parity Act

61. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

62. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

63. The Plan violated the Parity Act by denying provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy.

64. The actions of The Plan in failing to provide coverage for S.G.G.'s treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

65. The actions of The Plan has caused damage to the G. Family in the form of denial of payment of S.G.G.'s treatment.

66. The Plan is responsible to pay for S.G.G.'s treatment claim along with pre-judgment interest and attorney's fees and costs pursuant to 29 U.S.C. §1132 (g).

**RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

67. Judgment in the amount of S.G.G.'s past due treatment claims from September 4, 2018, through July 31, 2019.

68. Pre-and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

69. An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

70. For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 3rd day of February, 2023.

G. ERIC NIELSON & ASSOCIATES

*/s/ Laura Nielson*
Laura Nielson

*Attorney for Plaintiff*